No. 12.—DUNCAN CURRY, plaintiff in error, *vs* JOHN P. GAULDEN and others, defendants in error.

[4.] J G hired a slave from D C for one year, agreeing to pay him a certain sum therefor, and entered into a bond with securities, the obligation of which was that he would cause the slave to be forthcoming to the possession of D C on the 25th day of December, 1845, or pay the penalty of the bond. The slave ran away before the end of the year, and up to the time when action was brought upon the bond, the hirer had not been able to retake him: *Held,* that this was a specific contract of bailment; that the

bailor was not discharged by the slave's running away, as this was not an inevitable casualty, against which no provision could be made; or that if it were, the character of this contract seemed to authorize the conclusion, that the bailor intended to protect himself against the possibility of this slave making successful escape from bondage, whilst thus hired to the bailee, by requiring this bond from the latter.

Debt, in Decatur Superior Court.    Tried before Judge PERKINS, October Term, 1854.

This action was brought by Duncan Curry, on a bond given by defendants in error to him, at the time of hiring a negro man Allen.    This bond was in the penalty of $1.200, to be paid on 25th December, 1845.    The condition of the bond was, that the obligors "shall cause Allen, a boy, to be forthcoming to the possession of Duncan Curry, on the 25th day of December, 1845.    Then the obligation to be void, else to remain in full force".    The breach was that the boy was not forthcoming. The defendants pleaded that the negro ran away without the fault of the hirer, and that he had used due diligence to recover him without success.

On the trial, the Court charged the Jury that defendant's plea, if proven, was a good defence to the action.    This is the error assigned in this case.

R. F. LYON, for plaintiff in error.

R. SIMS, for defendant in error.

*By the Court.*—STARNES, J. delivering the opinion.

[1.] This is a case of bailment by hiring.    It is not a case where we are left to the general law of bailment, in order to ascertain the duty or charge which devolves on the bailee.    He has, by his own contract, (the bond in question,) created this, and taken it explicitly on himself.    The determination of this case, then, must turn upon the construction to be given to this instrument.

The condition of that bond is, that the obligees shall cause Allen (the slave) to be forthcoming to the possession of Duncan Curry, on the 25th day of December, 1845. Here is a direct and express undertaking, that the parties will have the slave hired, forthcoming to the possession of the hirer, or bailor, on the day specified.

The proof shows, that the slave was hired for the usual purposes, upon a plantation; that he ran away; that due diligence has been exercised to re-capture him, and the usual exertions made for this purpose; and that he had not been re-taken at the filing of this petition.

The reported cases are somewhat in conflict, as to what will discharge a bailee who has entered into a specific contract of this description. On the one hand, it has been sometimes held, that where the law creates a duty or charge, and the party is disabled to perform it without any default in him, and he hath no remedy over, there the law will excuse him—as in the case of waste, if a house be destroyed by tempest or by enemies, the lessee is excused. But where the party, by his own contract, creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by contract. And therefore, if a lessee covenant to repair a house, though it be burnt by lightning, or thrown down by enemies, yet he ought to repair it. (*Paradine vs. Jane, Aleyn's R.* 26 27. *Brecknock and Abergavenny Canal Co. vs. Pritchard,* 6 *T. R.* 720.) And see *Story on B.* § 36, and various cases there cited.

Other Courts and distinguished authors have held, that in cases of specific contract to keep safely, inevitable casuality will excuse. (*Jones on B.* 43, 44. 45. *Coggs vs. Bernard,* 2 *Lord Ray.* 909. *Powell on Con.* 446. *Com. Dig. Condition, D.* 1 *L.* 12 *B. Co. Litt.* 206.)

It does not become necessary for us to decide between these two classes of cases, and these opposing views; for in our opinion, there was no inevitable casualty here, in the eye of the law, or of reason.

The inevitable casualty contemplated by the law, is the act of God or of the State's enemies. The casualty in question does not fall within even the spirit of either of these—though it has been, in effect, so held in some cases decided in the Courts of Kentucky.

These cases, it seems, go in part upon the ground, that "the running away of the slave is a peril incident to the very nature of the property". So it is "incident," but not "inevitable". It is incident, as "running away is a peril incident to the very nature of the property" in a horse or mule. But who would think of holding that one who had undertaken, by special contract, to deliver a horse on a given day, should be excused by proving that he had run away. It is true that the liability of a slave's escape is much greater: but this is only a question of degree, and it cannot be said to be a casualty against which no provision could be made. It is not necessary to assume, that bolts and bars or chains would be necessary, in order to ensure the detention of the slave. Good treatment would, in most cases, do it quite as effectually. And such a contract as this before us might be made by the owner of a slave, for the express purpose of endeavoring to ensure such good treatment. We would not be understood as imputing harsh treatment of this slave to the hirer, in this case. There is nothing in the record to authorize this—and in what we have said, we are simply laying down general principles.

Another reason given for the decisions to which we have just referred is, that from the nature of the whole transaction, it was fairly inferable that the running away of the slave was not intended to be guarded against by the stipulations of the contract; and this is a much more satisfactory reason, distinguishing the cases from that before us.

In the first of these cases, *Singleton vs. Carrol*, (6 *J. J. Mar.* 528,) the action was upon a contract in writing, by which the defendant bound himself to pay $100 hire for the slave until Christmas—to furnish clothing, and to deliver him to the order of the hirer at the expiration of the time. There the Court held, that "there was nothing in the wording of the

covenant to justify the conclusion, that the parties, at the time of its execution, understood it as binding the appellees to deliver the slave named, at all events." And hence, the Court considered that the delivery, *at all events*, was not undertaken.

In the case of *Keas vs. Yewell*, (2 *Dana.* 348,) the action was on a bond to have the slave forthcoming to answer a decree upon foreclosure of mortgage. The Court say "the covenant must be treated and construed with an eye to the subject-matter about which it was entered into." To show what this was, they say, that "the apprehension and complaint of Yewell was, that Keas would remove the slave from the State before he could, by decree, subject her to the satisfaction of his demand;" and hence, it was held, that the escape of the slave, especially as the running away of the slave was a peril to which this property was "incident," from its peculiar nature, was not intended "to be guarded against by any stipulation in the contract."

In the case before us, there is nothing to authorize the inference, that such escape of the slave was not within the scope of the parties' intent, when the bond was executed. On the contrary, the character of the transaction, the specific and only stipulation, that the slave should be forthcoming at Christmas —the giving of bond and security to this effect, in a sum which was greater than the value of the slave, all seem suggestive of the fact that such escape was considered as possible, and was intended to be guarded against by the stipulations of the contract.

At all events, we do not see how, in the presence of such facts, we can say that such was not the intention of the parties to this record. And therefore, we reverse the judgment.